Saxe, J.E (dissenting).
Today, the majority ignores a clear and
unássailable land use restriction contained in a land disposition agreement entered into many years ago by the City of New York’s Department of Housing Preservation and Development (HPD) and a prior purchaser of the land, as part of an urban renewal plan. Its ruling would authorize a transfer of property in the absence of HPD approval of the conveyance, although the land disposition agreement concerning the property requires that any such transfer first be approved by HPD. I believe that this restriction on transfers contained in that land disposition agreement is binding, as a covenant running with the land, against any subsequent transferee of the property, and that it serves a bona fide public purpose, so that it is not for the present parties to blithely ignore this clear restraint.
This dispute concerns two adjacent parcels of real property just north of the South Street Seaport, an area of Manhattan that was subject to a 1967 urban renewal plan under which the City, in 1981, sold one of the properties with the express purpose of having a supermarket constructed and operated on the property for the next 25 years. To ensure that the property would not be turned over to another party for some other use during that 25-year period, when the City conveyed the property it included a provision that during that period, the property could be leased or subleased to a tenant other than the supermarket “only upon obtaining the prior written approval of H.P.D.” (emphasis added). This appeal concerns a contract by which the lessee, defendant Pathmark, agreed to assign its leasehold interest to plaintiff CPS Operating Company LLC, although it nei *9 ther obtained nor sought HPD approval. It requires us to decide whether Pathmark may, in effect, avoid the requirement of obtaining such approval by including in the lease assignment contract a provision listing the underlying land disposition agreement containing the pre-approval requirement as a “permitted exception.”
In the land disposition agreement dated June 3, 1981, the City of New York sold 227 Cherry Street to Cherry-Pike Corporation to be developed in accordance with the guidelines set forth in the urban renewal plan. The agreement therefore contained a variety of terms and conditions limiting the transfer, development and use of the property, including, in particular, a provision that the purchaser would develop the property as a supermarket and lease it to Supermarkets General Corporation for operation of a Pathmark supermarket. The agreement further provided that during the 25-year period after construction of the supermarket was completed, the property could be leased or subleased to some other tenant “only upon obtaining the prior written approval of H.RD.[,] which shall not be unreasonably withheld or delayed.”
On August 6, 1981, Cherry-Pike, as landlord, and Supermarkets General Corporation, now known as Pathmark Stores, Inc., as tenant, entered into the long-term lease contemplated in the earlier land disposition agreement, pursuant to which Path-mark was to construct and then operate a supermarket on the 227 Cherry Street parcel. The lease did not specifically make reference to the June 1981 disposition agreement or the requirement of HPD approval for assignment of the lease; indeed, contrary to the land disposition agreement, article 22 of the lease specifically permitted Pathmark to sublet or assign the lease.
On October 20, 1995, a similar land disposition agreement conveyed the neighboring parcel at 235-247 Cherry Street, also restricting the use and development of the property. A lease providing for the construction of a commercial building containing a pharmacy, termed “non-food retail operations,” was entered into on June 12, 1996. In 2003, Cherry Street LLC purchased the fee for 227 Cherry Street and the leasehold of 235-247 Cherry Street and is now Pathmark’s landlord for both pieces of property.
The 25-year period in which the land disposition agreement required the 227 Cherry Street property to be used for a supermarket, and in which HPD approval was required for any transfer of an interest in the property, ended on January 13, *10 2009, 25 years from the date on which a temporary certificate of occupancy was first issued for the supermarket.
Some time around 2004, Manhattan real estate developer Ex-tell Development, Inc., begin looking into the acquisition of rights to redevelop both properties, the real estate having substantially increased in value since its initial development. In 2007, Extell formed plaintiff CPS Operating Company for the purpose of acquiring Pathmark’s rights under the two leases, in contemplation of the eventual use of the property for something more profitable than a supermarket. On August 14, 2007, approximately 17 months before the expiration of the 25-year period, the parties entered into the contract under scrutiny here, by which Pathmark agreed to sell its leasehold interest in the properties to CPS for a price of $87 million. The closing date was set for November 30, 2007, and earnest money in the amount of $5 million was deposited. Thereafter, by letter dated November 23, 2007, CPS adjourned the closing to December 28, 2007, as it was permitted to do by the contract upon depositing an additional $1 million in earnest money.
In a letter to Pathmark dated October 31, 2007, Cherry Street LLC, the fee owner of the property, protested that the contract between Pathmark and CPS was “in abrogation of the specific requirements under the Lease and at law,” characterized the deal as having been made “with the full knowledge that, upon acquisition of the Lease, Extell shall demolish Tenant’s Building . . . and construct a new building for residential condominium units,” and asserted that the sale of the leasehold violated section 401 (B) of the land disposition agreement, which permitted a sublease during the 25-year period only upon HPD approval. The letter concluded by demanding that Pathmark rescind its contract with CPS/Extell.
Pathmark responded to this letter with a letter dated November 2, 2007, denying any violation of the lease or any other agreement. Copies of both letters were forwarded to CPS on November 5, 2007.
On December 27, 2007, the day before the adjourned closing date, CPS sent a letter to Pathmark in which it characterized the October 31, 2007 letter from Cherry Street LLC as a notice that Pathmark was in breach of the lease for failing to obtain HPD approval to the leasehold assignment, terminated the contract in reliance on that asserted breach, and demanded return of its $6 million in earnest money. The next day CPS commenced this action seeking a declaration of the parties’ *11 rights and the return of its earnest money. Pathmark’s position, as conveyed in its letter dated December 31, 2007 and its answer and counterclaim, is that CPS defaulted under the contract by failing to complete the closing scheduled for December 28, 2007, and that therefore Pathmark was entitled to retain the earnest money. It sought declaratory relief in its favor.
Both parties moved unsuccessfully for summary judgment. The motion court held that a question of fact was presented as to whether CPS intended to waive its right to have Pathmark obtain HPD approval of the assignment. Only Pathmark appeals; CPS now agrees that material issues of fact preclude summary judgment.
CPS contends that Cherry Street’s October 31, 2007 letter to Pathmark constituted a default notice, entitling CPS to terminate the contract based on the inaccuracy of Pathmark’s representations in section 8 of the leasehold assignment contract that it was “not prohibited from consummating the transaction[ ]” and that there was “no material default by [Pathmark] under any Leases which would entitle the landlord thereunder to terminate such Lease.” Further, CPS asserts, the absence of HPD approval violated section 12 of the leasehold assignment contract, which required Pathmark to convey an “insurable leasehold interest.”
Pathmark, for its part, contends that it was fully in compliance with its contractual obligations and that CPS’s claim of breach was specious, an attempt to avoid a contract that intervening market forces had rendered unprofitable. In arguing that CPS’s action must be dismissed as a matter of law, Pathmark suggests that the court must consider the surrounding events and circumstances to properly understand the import of the parties’ actions. For one thing, it asserts, when the current fee owner of the property, Cherry Street LLC, purchased the fee interest in the land in 2003, it did so with the express intent of redeveloping the properties, which would necessarily include its acquiring the leasehold back from Pathmark; in fact, Pathmark asserts, Cherry Street LLC had negotiated, albeit unsuccessfully, to purchase the leasehold back from it. Furthermore, when Extell began negotiations with Pathmark to acquire the leasehold, it was simultaneously negotiating with Cherry Street LLC to purchase its fee interest in the property, and when CPS made the deal with Pathmark, it did so in the expectation that it would ultimately reach a deal with Cherry Street LLC as well.
*12 Thus, Pathmark suggests, Extell and Cherry Street LLC were effectively competitors in the quest to obtain the right to redevelop the property, and, consequently, Cherry Street’s October 31, 2007 letter to Pathmark, asserting that the lease assignment contract breached the underlying lease and the land disposition agreement, was not the objective assessment of a disinterested landowner, but, rather, was a strategic effort to protect its own interests. Further, CPS’s treatment of Cherry Street’s letter as a valid notice of default was not an honest assessment of the validity of the letter as such, but was rather a means of attempting to avoid a valid contract because the value of the real estate had become drastically reduced in the intervening months.
Pathmark also points out that CPS’s deposit of an additional $1 million in earnest money on November 23, 2007 so as to adjourn the closing for a month, despite having received notification of the October 31, 2007 letter from Cherry Street, demonstrates that it gave no real credence to Cherry Street’s claim that the lease assignment breached any contractual duty of Pathmark.
The majority now rules in Pathmark’s favor, dismissing CPS’s complaint on the ground that there was no default, reasoning that the HPD-approval requirement may be treated as a “permitted exception,” subject to which CPS had agreed to take the property, and that the circumstances show that in any event CPS was willing to close on the deal without prior HPD approval.
I respectfully disagree, concluding that regardless of the parties’ intentions or beliefs, they may not be permitted to avoid, by agreement, the requirement that HPD pre-approve any transfer of the subject property. Allowing the parties to avoid the HPD approval requirement either by interpreting the permitted exceptions provision of the parties’ contract to allow the transfer despite a lack of prior approval, or by allowing the buyer to waive that requirement, improperly subverts the important component of the land disposition agreement by which the City ensured that its urban renewal plan would not be eviscerated or undermined.
Preliminarily, it is important to recognize that the land disposition agreement’s requirement of prior HPD approval before any assignment of the lease is equally binding on Pathmark as on the original signatories to the agreement, even though Path-mark’s lease specifically permits assignments. While Pathmark *13 was not a party to the land disposition agreement between the City and the purchaser of the property, Pathmark is nevertheless bound by the HPD-approval provision, because the provision qualifies as a covenant running with the land, that is, a restriction on the use of the property that is binding on subsequent grantees (see Neponsit Prop. Owners’ Assn. v Emigrant Indus. Sav. Bank, 278 NY 248 [1938]). As such, it was binding on Path-mark to the same degree as it was on Cherry-Pike or Cherry Street LLC (see 328 Owners Corp. v 330 W. 86 Oaks Corp., 8 NY3d 372 [2007]).
The permitted exceptions provision of the lease assignment contract does not entitle Pathmark to convey its interest in the leasehold despite the absence of HPD approval, because the concept of permitted exceptions does not include this type of requirement.
“Permitted exceptions” are generally understood as encumbrances listed in a real property contract that need not be removed by the seller (see 3 Warren’s Weed, New York Real Property § 32.70 [5th ed] [Practice Tip]). When a real estate contract identifies an encumbrance on title as a permitted exception, it is expected by the parties that the transaction can and will proceed despite that encumbrance (681 Chestnut Ridge Rd. LLC v Edwin Gould Found, for Children, 23 Misc 3d 1110[A], 2009 NY Slip Op 50694[U] [2009]).
The permitted exceptions listed in the contract at issue here are typical; they include zoning restrictions, easements, encroachments, adverse possession claims, existing mortgages, leases, and existing code violations (see e.g. 681 Chestnut Ridge Rd. LLC v Edwin Gould Found, for Children, supra; O.W. Siebert Co. v Kramer, 107 Misc 2d 520, 521 [1980]). The hallmark of such typical permitted exceptions is that they affect good title, but do not preclude the buyer from taking title. Basically, the use of permitted exceptions arranges for the buyer to step into the shoes of the seller and take exactly that form of encumbered title that the seller currently possesses.
The requirement of prior HPD approval is fundamentally different. It does not merely encumber the property; rather, it prohibits the transfer of any interest in the property in its absence. Unlike permitted exceptions, the requirement of HPD approval to the transfer cannot be passed along to be resolved by the next possessor of the property, because if the parties do not comply with it, the transfer itself is impermissible. So, although the list of permitted exceptions includes the “Terms *14 [and] Covenants” of the land disposition agreement, and the HPD approval requirement is among those terms and covenants, the provision of the land disposition agreement that requires HPD approval to a conveyance of the property does not qualify as a permitted exception.
The essence of why the HPD approval requirement may not be avoided as a permitted exception, subject to which the buyer may agree to take the property, is because it represents a right belonging to the City, not to either party. It was inserted in the land disposition agreement to protect the City’s interest in re-mediating urban blight and revitalizing the neighborhood in accordance with the urban renewal plan, by ensuring that for a sufficient period of time, an amenity necessary to support a residential neighborhood would be available to residents of the area. To accomplish that end, it sought to ensure that private owners could not enter into an agreement turning the property over to another private party for a use other than the one that the City’s plan required. To approve of a deal that would allow the parties to transfer the property without obtaining the required HPD approval, by the expedient of terming that requirement a permitted exception, is to contravene the important principles of land use underlying the land disposition agreement itself.
It is worth noting that there is a sense in which the HPD approval requirement can properly be treated as a permitted exception. That is, even following a proper, HPD-approved transfer, the requirement would remain to be complied with by the purchaser of the property, applicable to any further transfers during the 25-year period. So, listing the requirement as a permitted exception functions as a recognition by the buyer that the requirement will be imposed on it, in turn, once the property is conveyed. But the requirement can be treated as a permitted exception only to that extent. It may not be used to permit a party to evade a contractual duty to take an affirmative step prior to conveying an interest in the property, and may not be understood to shift to CPS, after the contemplated conveyance, an obligation that fell to Pathmark prior to the contemplated conveyance.
The error in accepting the proposition that HPD approval may be ignored because it is listed as a permitted exception can be seen more clearly by considering a hypothetical situation in which the equivalent conveyance is arranged after only five years of the 25-year period in which HPD approval is required, *15 without any action being taken to obtain that approval. The proponent of the deal might argue, as Pathmark does here, that the conveyance is proper and may proceed unless the City takes steps to prevent it. But it is difficult to imagine that, so soon after the land was first conveyed as part of a long-term urban development plan, a court could issue a ruling authorizing a conveyance of the lease in the absence of the requisite HPD approval simply because the City had not been brought into the case by either party to the proposed transaction. The failure to abide by a precondition to the proposed conveyance of the lease is apparent from the face of the documents, and would necessitate finding the conveyance impermissible.
Yet the majority finds that the proposed conveyance does not amount to a breach of Pathmark’s obligations under the land disposition agreement, despite the lack of HPD approval, and suggests that authorizing the lease assignment would not subvert the very purpose of that agreement because its ruling “does not preclude [the land disposition agreement’s] ultimate enforcement.” I cannot accept the suggestion that the City’s continuing entitlement to take legal action challenging the lease assignment even after the deal has closed justifies authorizing a lease assignment contract that on its face violates the land disposition agreement.
The City should not need to intervene in a litigation or take any other additional action to protect the interests it already took steps to protect in 1981 by including in the land disposition agreement the requirement that HPD pre-approve any transfer of the property. If the requirement has not been complied with, it should be apparent that a precondition to the proposed conveyance has not been satisfied. By ignoring the precondition just because the City has not taken additional legal action to stop the parties’ transaction, this Court effectively obliterates that precondition.
It is true that in the circumstances presented here only 17 months remained on the 25-year period, so, as a practical matter, it was pointless for the City to make any objection to the lack of application for HPD approval; there would, in fact, be no change in the use of the land until after the expiration of the 25-year period. But, our decision as to whether the parties could, by contract, transfer the subject property despite the failure to comply with the HPD approval requirement should be founded on the terms of the controlling documents. It should not depend on whether the time remaining on the HPD approval require *16 ment was 10 years or 10 months, and it should not depend on whether, as a practical matter, the injury to the City will be severe enough to prompt it to take affirmative legal action.
As the majority correctly observes, to all appearances, CPS entered into the contract willing to close on the deal without concern for prior HPD approval, and its willingness to ignore the approval requirement was further demonstrated when it deposited an additional $1 million in earnest money after Cherry Street’s notice dated October 31, 2007. The majority makes much of the notion that CPS is using the consent obligation pretextually, in order to avoid its obligations under the parties’ contract. But resolution of this appeal cannot properly turn on the premise that CPS had been willing to ignore the requirement of HPD approval until plummeting property values prompted it to extricate itself from the deal by taking advantage of Cherry Street LLC’s earlier assertion that the parties’ deal breached the underlying land use documents. To say that until December 28, 2007, CPS had shown that it was willing to take the risk that, after the conveyance, HPD might not approve of its intended use of the land, or that it expected to receive HPD approval for its intended use, may be true, but it misses the point. CPS did not have the authority to agree to eliminate the City’s right to prevent the transfer itself, which the City could do by declining to approve the deal.
It makes no difference whether CPS’s sudden reliance on a violation of the land disposition agreement was disingenuous. Enforcement of the consent requirement has nothing whatsoever to do with any party’s motivation or self-interest. Whatever CPS’s motivations, the legal question remains the same: Was CPS correct in asserting that Pathmark was in default of the contract because, in violation of the land disposition agreement, HPD approval for the deal had not been obtained? And, if Pathmark was in default, was that a default that CPS was entitled to waive?
Although Cherry Street’s October 31, 2007 letter was incorrect insofar as it protested that the lease assignment was invalid because the assignee planned to construct a residential condominium—in fact there was no definite plan at that point, and, indeed, the assignment contemplated subleasing the supermarket back to Pathmark until the expiration of the 25-year period, when HPD approval would no longer be needed—nevertheless, the letter correctly pointed out the violation of the requirement of HPD approval for a lease, sublease or assign *17 ment, which had to be satisfied before the lease assignment could properly be completed.
In moving for summary judgment, Pathmark argued that as a matter of law the permitted exceptions provision of the lease assignment contract freed it from the obligation to obtain the approval of HPD prior to conveying its interest. Because the motion court correctly rejected that reasoning, its denial of the motion was proper, and should be affirmed.
Friedman, Renwick and Abdus-Salaam, JJ., concur with Acosta, J.; Saxe, J.R, dissents in a separate opinion.
Order, Supreme Court, New York County, entered February 27, 2009, reversed, on the law, without costs, the motion for summary judgment granted, and the complaint dismissed.